IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINH-SANH TRADING CORPORATION, a California Corporation<br><br>Plaintiff,<br><br>v.<br><br>SFTC, INC., D.B.A. SUN FAT TRADING CORPORATION, a California Corporation,<br><br>Defendant. | Case No. 19-CV-04315-CRB<br><br>**ORDER DENYING PRELIMINARY INJUNCTION** |

Now pending is Plaintiff Vinh-Sanh Trading Corporation's ("Vinh-Sanh") motion for a preliminary injunction against Defendant SFTC, Inc. ("Sun Fat"). See MPI (dkt. 39) at 1–2. Vinh-Sanh seeks to enjoin Sun Fat from further using allegedly infringing marks in its sale of Thai jasmine rice. Id. The Court DENIES the preliminary injunction for the reasons below.

## I. BACKGROUND

Vinh-Sanh imports and distributes rice and rice-based products. Compl. (dkt. 1) ¶ 9. Its most popular product is Thai jasmine rice, which it sells throughout the United States. Id. ¶¶ 10, 12. In the mid-1980s, Vinh-Sanh established the THREE LADIES brand, and developed a trademark consisting of a drawing of three women wearing clothing representing the countries of Cambodia, Vietnam, and Laos. Id. ¶ 11. Vinh-Sanh has four trademarks in connection with the THREE LADIES brand. See Compl. ¶ 13; TRO App. (dkt. 11) at 4.

Sun Fat is an importer, distributor, and wholesale buyer of Asian foods. Compl. ¶

22. Vinh-Sanh works with a variety of distributors and briefly had a wholesale relationship with Sun Fat "for the sale of a small quantity of THREE LADIES rice." Id. ¶ 23. Vinh-Sanh "terminated the relationship with Sun Fat" when it discovered that, in its view, Sun Fat was infringing the THREE LADIES mark. Id. ¶ 24. Sun Fat had started marketing and selling Thai jasmine rice with the images—photographs, not drawings—of three women wearing what Vinh-Sanh asserts is clothing representing the countries of Cambodia, Vietnam, and Laos. Id.

Vinh-Sanh brought suit for federal trademark infringement under 15 U.S.C. § 1114, Federal Unfair Competition under 15 U.S.C. § 1125(a), Common Law Trademark Infringement, and Unfair Competition under Cal. Bus. & Prof. Code § 17200. See generally Compl. Vinh-Sanh applied for a temporary restraining order (TRO) on August 2, 2019. See generally TRO App. The Court denied the TRO. The Court concluded that while Vinh-Sanh was likely to succeed on the merits, and an injunction was in the public interest, Vinh-Sanh had not shown irreparable harm. See Tr. of Aug. 9, 2019 Proceedings (dkt. 27) at 3:19–22. The Court gave the parties leave to conduct further discovery on irreparable harm prior to briefing a preliminary injunction motion. Tr. of Aug. 9, 2019 Proceedings at 3:13–4:12. Vinh-Sanh subsequently filed a motion for preliminary injunction. See generally MPI. Sun Fat opposed the motion. See generally MPI Opp'n (dkt. 44). Vinh-Sanh replied. See generally MPI Reply (dkt. 45).

In its motion for preliminary injunction, Vinh-Sanh asked the Court to enjoin Sun Fat from: (1) manufacturing, producing, sourcing, importing, selling or offering for sale, distributing, advertising, providing, or promoting any goods or services with the allegedly infringing marks; (2) using the infringing marks or any "false designation of origin, or false or misleading description or representation of fact"; (3) "further infringing the rights of Vinh-Sanh in and to its THREE LADIES Marks or otherwise damaging Vinh-Sanh's goodwill or business reputation"; (4) "competing unfairly with Vinh-Sanh in any manner"; and (5) "continuing to perform any other unlawful acts in any manner whatsoever complained of in the Complaint[.]" See MPI at 2.

2

## II. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Rodriguez v. Robbins, 715 F.3d 1127, 1133 (9th Cir. 2013) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). The Ninth Circuit allows a "sliding scale approach," such that if the plaintiff can show "serious questions going to the merits," that a balance of hardships tips sharply toward the plaintiff, that there is likelihood of irreparable injury, and that the injunction is in the public interest, a preliminary injunction may still issue. See Kiva Health Brands, LLC v. Kiva Brands, Inc., 2019 WL 4249075, No. 19-cv-03459-CRB, at *3 (N.D. Cal. Sep. 6, 2019) (quoting Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (internal quotation marks omitted).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

The Court continues to conclude that Vinh-Sanh is likely to succeed on the merits of a trademark infringement claim. To prevail on such a claim, a plaintiff must demonstrate (1) ownership of a valid trademark and (2) use by defendant in commerce of a mark likely to cause confusion. See Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011).

#### 1. Ownership of Mark

Vinh-Sanh owns its trademarks. Vinh-Sanh registered the THREE LADIES Composite Mark on May 31, 2005, claiming a first use in commerce in May of 1986, and registered its Vietnamese-language Word Mark on October 8, 2013, with a first use in commerce of 2004. See MPI at 9; Aug. 2. Chen Decl. Ex. C, D, E, F (dkt. 12). Vinh-Sanh's registration and ownership of the marks constitutes prima facie evidence of the marks' validity and Vinh-Sanh's exclusive right to use the marks in commerce. See 15 U.S.C. § 1115(b); Applied Info. Scis. Corp. v. eBAY, Inc., 511 F.3d 966, 970 (9th Cir.

3

1    2007). Vinh-Sanh has used the marks continuously in commerce since 1986. See MPI at
2    9; Aug. 2 Chen Decl. ¶ 10.

### 2. Likelihood of Confusion

Vinh-Sanh is also likely to succeed in demonstrating a likelihood of confusion. There is a likelihood of confusion between two products "when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 825 (9th Cir. 1993) (quoting Metro Publishing, Ltd. v. San Jose Mercury News, 987 F.2d 637, 640 (9th Cir. 1993) (abrogated on other grounds)). The Ninth Circuit analyzes likelihood of confusion by referring to eight factors identified in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348–49 (9th Cir. 1979) (abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792 (2003)): (a) strength of the mark; (b) similarity of the marks; (c) proximity of the goods/services sold; (d) similarity in the marketing channels used; (e) type of goods/services and degree of care likely to be exercised by purchasers; (f) evidence of actual confusion; (g) defendant's intent in selecting its mark; and (h) likelihood of expansion into other markets.

#### a. Strength of the Mark

Strong marks are inherently distinctive and are "afforded the widest ambit of protection," whereas a "descriptive mark tells something about the product [and] will be protected only when secondary meaning is shown." Sleekcraft, 599 F.2d at 349. That Vinh-Sanh registered the trademarks without being required to prove secondary meaning supports the conclusion that the marks are inherently distinctive. See Americana Trading, Inc. v. Russ Berrie & Co., 966 F.2d 1284, 1287 (9th Cir. 1992) (registered marks presumed to be distinctive). Moreover, the THREE LADIES mark is distinctive on its face. See Lahoti v. Vericheck, Inc., 586 F.3d 1190, 1198 (9th Cir. 2009) ("'primary criterion' for distinguishing between a suggestive and a descriptive mark 'is the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from

4

the mark to the particular product.'") (internal citation omitted)). "THREE LADIES" does not describe the rice or its features—it is instead fanciful and arbitrary, like "Dutch Boy" as a name for paint. See Sleekcraft, 599 F.2d at 349 (citing National Lead Co. v. Wolfe, 223 F.2d 195, 199 (9th Cir. 1955), cert. denied, 350 U.S. 883 (1955)).

Trademarks consisting of non-English words must pass the "foreign equivalents" test: the mark is translated into English to see whether, "to those American buyers familiar with the foreign language, the word would have a descriptive connotation." See McCarthy on Trademarks, § 11:34 (5th Ed.); see also Bart Schwartz Intern. Textiles, Ltd. v. F.T.C., 129 U.S.P.Q. 258, 289 F.2d 665, 668 (1961) ("[A] descriptive word in a foreign language cannot be registered in the United States as a trademark for the described product."). Because Vinh-Sanh's Vietnamese mark translates to "Three Ladies" or "Three Girls," it is just as arbitrary and fanciful as the English mark and is thus just as distinctive a mark.

Strong marks also show "commercial strength," a feature "based on 'actual market recognition[.]'" Network Automation, Inc., 638 F.3d at 1149. Though the commercial strength inquiry is "evidence-intensive" and "unnecessary at the preliminary injunction stage[,]" it is worth noting that Vinh-Sanh would likely make a successful showing here as well. See id. at 1150. Vinh-Sanh asserts that the brand "is widely recognized by customers, and has further attained incredible commercial success over some thirty-plus years of use[.]" MPI at 11.

Sun Fat argues that the Design Mark is not strong because "there are other well-known rice brands that feature on the bags drawings of three Asian figures." TRO Opp'n (dkt. 23) at 11. Sun Fat CEO Benny Hong declares that there are "other popular rice brands" that include drawings of three Asian people, such as Three Farmers and Three Kings. Hong Decl. (dkt. 23-1) ¶ 20; see also Xiong Decl. (dkt. 23-7) ¶ 10 ("several companies in the rice and Asian foods market . . . use drawings of three ancient Asian characters."). The Court was presented with no examples. While examples of extensive third party use of an image much like the THREE LADIES mark would weaken Vinh-Sanh's claim, see Hero Nutritionals LLC v. Nutraceutical Corp., No. SACV 11-1195 AG

1  (MLGx), 2013 WL 4480674, at *4 (C.D. Cal. Aug. 16, 2013) (extensive third party use demonstrated weakness of marks), at this stage, the Three Ladies mark appears strong.

### b. Similarity of the Marks

"Similarity of the marks is tested on three levels: sight, sound, and meaning," and each must be considered as encountered in the marketplace. Sleekcraft, 599 F.2d at 351. Even assuming that the THREE ASIAN LADIES identifier from the Sun Fat website, Chen Decl. Ex. H (dkt. 12), is no longer on display, the image on the Sun Fat rice, Chen Decl. Ex. G—a photograph of three women in traditional Asian clothing—is strongly reminiscent of the image on Vinh-Sanh's rice, Chen Decl. Ex. B, a drawing of three women in traditional Asian clothing with the words "Three Ladies Brand" underneath. Both show three women smiling while wearing different traditional Asian dresses, though the Vinh-Sanh image shows the women's full bodies and the Sun Fat image cuts off above the women's knees, the women are doing different things with their hands in the two images, and the Vinh-Sanh image is a drawing while the Sun Fat image is a photograph. Compare Chen Decl. Ex. B and Chen Decl. Ex. G.

Sun Fat argues that the distinction between a drawing and a photograph is significant. See TRO Opp'n at 8; MPI Opp'n at 10. But the likelihood of confusion for a consumer in the marketplace is not necessarily that they mistake one image for another—it is that they will perceive Sun Fat's package, with a photograph of three women in traditional Asian dress, as an updated version of the drawing of three women in traditional Asian dress that they are accustomed to seeing on Vinh-Sanh's product. See MPI at 12. Sun Fat's citation to Funrise Canada (HK) Ltd. v. Zauder Bros., Inc., No. 99-cv-1519 (ARR), 1999 WL 1021810, at *22 (E.D.N.Y. July 2, 1999), in which the court noted the difference between a "photograph of a witch" and a "drawing of a fanciful phantom-like ghoul" is not helpful—this case is more like a photograph of a witch versus a drawing of a witch. See TRO Opp'n at 8. The same is true of Gameologist Group, LLC v. Scientific Games Int'l, Inc., 838 F. Supp. 2d 141, 160–61 (S.D.N.Y. 2011), where the images were "visually dissimilar," not only because one was a photograph and one a drawing, as Sun

Fat asserts, see TRO Opp'n at 8, but because, among other things, one "depicts photographs of cars, scantily-clad women, and stacks of hundred dollar bills" while the other "depict[s] drawings of diamonds, flowers, butterflies, and in one instance, a cartoon of an anthropomorphized lottery ticket," see Gameologist Group, 838 F. Supp. 2d at 161.

Sun Fat also made much of the argument that its three women are not wearing clothing representing Cambodia, Vietnam, and Laos (as in the Vinh-Sinh image) but either Cambodian, Hmong and Vietnamese clothing, or Thai, Vietnamese, and Hmong clothing. See TRO Opp'n at 9. It is true that the dresses are different. Of the three women pictured in the two designs, the first woman looks the most similar in both images, with an elaborate, pointed headpiece; the second woman in both images has a long-sleeved floral dress (though the second Vinh-Sanh woman is wearing a headpiece while the second Sun Fat woman is not); and the third woman is the most different—while the Vinh-Sanh woman wears a flower in her hair and a sleeveless dress, the Sun Fat woman wears a triangular headpiece and three-quarter sleeve dress, though both dresses exhibit prominent collars. Compare Chen Decl. Ex. B and Chen Decl. Ex. G.

Sun Fat also argues that the THREE LADIES name appears below the image of the three women on the Vinh-Sanh rice, while Sun Fat does not use the name "three ladies" anywhere on its rice. See TRO Opp'n at 8; MPI Opp'n at 11. This is a difference between the two images—and of course other words on the rice bags are different as well (though both are bags of "Jasmine Rice" and "Thai Hom Mali Rice").

Ultimately, while there are differences between the two images, at a higher level of abstraction the consumer in the marketplace is faced with two bags of jasmine rice, both with images of three women in traditional, formal, Asian dresses. While Sun Fat continues to emphasize the different individual elements in each design, see MPI Opp'n at 10, Vinh-Sanh argues persuasively that this "does not alter the conclusion that [Sun Fat's] three women design mark looks highly similar to and carries precisely the same commercial impression as [Vinh-Sanh's marks]," see MPI Reply at 10. And where the parties offer competing goods, a lower level of similarity between the marks themselves will support a

7

finding of likelihood of confusion. See Sleekcraft, 599 F.2d at 350; Nautilus Grp., Inc. v. ICON Health & Fitness, Inc., 372 F.3d 1330, 1345 (Fed. Cir. 2004). This factor favors Vinh-Sanh.

### c.  Proximity of the Goods/Services Sold

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." Sleekcraft, 599 F.2d at 350. It is undisputed that the parties are using the marks on the exact same product: jasmine, or Thai Hom Mali, rice.

### d.  Similarity in the Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." Sleekcraft, 599 F.2d at 353. Vinh-Sanh asserts that Sun Fat's rice "appears alongside Vinh-Sanh's genuine THREE LADIES rice in many stores." TRO App. at 6 (citing Tony Ly Decl. (dkt. 13) ¶ 6, Chen Decl. ¶ 24). The two products seem to employ similar marketing channels, then. Sun Fat asserts, however, that Vinh-Sanh has "deliberately refused to compete with Sun Fat" in the Central Valley market. See TRO Opp'n at 13–14. Vinh-Sanh sells its rice throughout the country, see Chan Decl. ¶ 8, but it is not clear how widely Sun Fat sells its allegedly infringing product and thus whether its marketing channels go beyond the Central Valley. (Even so, that Vinh-Sanh stopped "virtually all of its sales to the Central Valley," Hong Decl. ¶ 17, is not the same as its not competing at all in the Central Valley). This factor is not significant to the Court's analysis.

### e.  Types of Goods/Services and the Degree of Care Likely to be Exercised by Purchasers

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." Sleekcraft, 599 F.2d at 353. "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely." Id. "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." Id.

8

Vinh-Sanh submits evidence that it has goodwill in its products and "[o]ur customers have come to recognize THREE LADIES rice as the best quality." Chen Decl. ¶ 8; see also Tony Ly Decl. ¶ 4 ("Our customers are highly familiar with the THREE LADIES Brand and the logo of the three ladies—it is the most popular rice we have and has been purchased by our customers for many years."); but see id. ¶ 6 ("I believe many customers only look at the picture of the three ladies and will not notice the brand name so they will buy Sun Fat rice when they wanted to buy VINH-SANH TRADING CORPORATION's THREE LADIES Brand rice."). This suggests that Vinh-Sanh's customers are, if not buyers with "expertise in the field," perhaps discerning. Sun Fat emphasizes this point as well: "customers become loyal to the particular brands of rice that they and their families enjoy." See TRO Opp'n at 9 (citing Hong Decl. (dkt. 23-1) ¶ 13; Xiong Decl. (dkt. 23-2) ¶ 9). Sun Fat argues also that "the relevant customers here are more likely to take care in selecting the particular rice they buy." MPI Opp'n at 11.

Thus, although the goods here are presumably inexpensive, there is evidence that customers use care in choosing their rice. This factor is mixed.

### f. Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely," but "[p]roving actual confusion is difficult[.]" Sleekcraft, 599 F.2d at 352. Sun Fat submitted declarations from market employees declaring that "Never have any customers been confused as to Lucky Coin [the Sun Fat brand name] and Three Ladies coming from the same company," Bee Xiong Decl. (dkt. 23-2) ¶ 6, and "None of our customers have ever been confused as to the identity of any kind of partnership or the like between Three Ladies, Lucky Coin or any other of Sun Fat's many products," Keng Xiong Decl. (dkt. 23-6) ¶ 11, Sam Xiong Decl. (dkt. 23-7) ¶ 11 ("None of our customer have ever been confused as to the identity or any kind of partnership of the like between Three Ladies, Lucky Coin or any other of Sun Fat's many products."). While Vinh-Sanh asserts that its "retailers report that consumers are being or will very likely be confused by Sun Fat's infringing rice, especially so that it appears alongside Vinh-Sanh's

9

genuine THREE LADIES rice in many stores," TRO App. at 6 (citing Tony Ly Decl. ¶ 6, Chen Decl, ¶ 24), the evidence of actual consumer confusion is scant, see Tony Ly Decl. ¶ 6 ("Our store decided not to carry the Sun Fat Lucky Coin Brand rice with the picture of three Asian women in order to avoid confusion"); Chen Decl. ¶ 24 (same quote as in Application).

While not an instance of consumer confusion, in the reply to its MPI, Vinh-Sanh provided the declaration of Cindy Lau, the owner of Maxim Market #1, who declared that she experienced actual confusion between Three Ladies and Lucky Coin rice. See Lau Decl. (dkt. 45-2). In mid-2019, Lau received a shipment of Lucky Coin rice and believed that it was Three Ladies rice; she called the representative of her Three Ladies rice supplier, First World Trading's Cam Mach, to inquire about new packaging. See id. ¶¶ 7–10. Lau's declaration lends some support to the notion that individual customers would also become confused, but her own confusion is not terribly significant. This factor is mixed.

### g. Defendant's Intent in Selecting its Mark

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." Sleekcraft, 599 F.2d at 354. Sun Fat's CEO asserts that he discontinued the previous design on Sun Fat's Thai jasmine rice in 2015 "because I learned that the Thai model featured in the photo on the bag for that brand of rice had passed away." Hong Decl. ¶ 12.[1] "[T]o update the bag design" on its Lucky Coin rice, he declares, "I decided we would use a photo of a new Thai model, and, because we have many customers from the Hmong and Vietnamese communities, the new bag would feature photos of Hmong and Vietnamese models as well." Id. ¶ 14. While this is an innocent explanation, it is not altogether persuasive, given Vinh-Sanh's undisputed brand dominance and the fact that Sun Fat was aware of Vinh-Sanh's product having "for over a

---

[1] The previous design is included in the Complaint ¶ 27.

decade . . . engaged in a wholesale relationship . . . with Sun Fat for the sale of a small quantity of our THREE LADIES rice" and "distributed [Vinh-Sanh's] genuine THREE LADIES rice to markets in the U.S." See Chen Decl. ¶ 18.

Vinh-Sanh, in its preliminary injunction motion, re-asserts that Sun Fat selected the mark in bad faith, "plainly intend[ing] to trade upon Vinh-Sanh's goodwill." MPI at 12. Vinh-Sanh notes that Sun Fat continues to sell products in packaging depicting the deceased Thai model. See id. at 13. Sun Fat responds that it "simply did not elect to immediately rebrand those products because they were not in wide circulation," as opposed to its successful Lucky Coin rice. See MPI Opp'n at 14. Sun Fat argues that CEO Benny Hong was uncomfortable releasing a "high-volume product featuring a model he understood to be deceased." Id. at 14; Benny Hong Depo., Ex. 4 (Dkt. 44-4).[2]

Overall, Sun Fat's knowledge of Vinh-Sanh's Three Ladies mark is a factor that favors Vinh-Sanh.

### h. Likelihood of Expansion into Other Markets

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." Sleekcraft, 599 F.2d at 354. "When goods are closely related, any expansion is likely to result in direct competition." Id. There is no real argument about this by the parties, though there is evidence that Sun Fat's design is part of a rebranding, and that "Sun Fat has been working hard to promote this rice product" and making "significant investment in promotions and advertising." Hong Decl. ¶ 15. Prior to the TRO hearing, moreover, Sun Fat also had "a substantial inventory of [its allegedly infringing] product (about 1,500 bags) that [it] hope[d] to sell." Id. ¶ 16. It is unclear to what extent Sun Fat has depleted its stock since then, however. There therefore appears to be some possibility of Sun Fat's expansion into

---

[2] Sun Fat also suggests that the deposition testimony of its retired founder, Mr. Ming Hong, is "tainted by the glaring translation that occurred." MPI Opp'n at 14. For the purposes of the preliminary injunction, it suffices that Sun Fat adopted its mark knowing of Vinh-Sanh's marks.

11

other markets, though it is speculative.

                **i.**      **Overall Showing on Likelihood of Confusion**

In light of all of the Sleekcraft factors—particularly the strength of the Vinh-Sanh mark, the similarity of the parties' marks, the proximity of the goods, and Sun Fat's intent—the Court holds that Sun Fat's use of the allegedly infringing mark is likely to cause confusion. See Network Automation, Inc., 638 F.3d at 1144.

        **3.**     **Conclusion as to Likelihood of Success**

Because Vinh-Sanh has shown both (1) that it owns a valid mark and (2) that Sun Fat's use of its mark is likely to cause confusion, Vinh-Sanh is likely to succeed on the merits of its trademark claim. See id.

**B.**     **Irreparable Harm**

The Court now turns to the requirement of irreparable harm. See Rodriguez, 715 F.3d at 1133. Vinh-Sanh has not made a strong enough showing of irreparable harm to warrant injunctive relief.

Irreparable harm is no longer presumed where there is a strong case of trademark infringement. See Herb Reed. Enters., LLC v. Florida Entm't Mgmt., 736 F.3d 1239, 1249 (9th Cir. 2013). "Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm. . . . however, the court's pronouncements [must be] grounded in . . . evidence. . . ." See id. at 1250; see also SunEarth, Inc. v. Sun Earth Solar Power Co., 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) ("The Ninth Circuit has recognized that the potential loss of good will or the loss of the ability to control one's reputation may constitute irreparable harm for purposes of preliminary injunctive relief.") (internal quotation marks omitted).

This Court recently noted that "a conclusory and self-serving declaration by the head of a plaintiff's company is, standing alone, weak evidence of irreparable harm." See Kiva Brands, Inc., 2019 WL 4249075, at *14. The court in SolarEdge Technologies Inc. v. Enphase Energy, Inc. found that the plaintiffs had made only a "bare, threshold" showing of irreparable harm where the plaintiff offered statements of an executive, but where "the

record lack[ed] any data that support[ed] her conclusions." No. 17-cv-04047-YGR, 2017 WL 3453378, at *6 (N.D. Cal. Aug. 11, 2017).

The evidence of irreparable harm in this case is thin. First, Vinh-Sanh asserts that it tested the quality of Sun Fat's rice, and found it to be "of lower quality in terms of softness, whiteness, and freshness compared to the THREE LADIES rice." MPI at 14 (citing Viau Decl. ¶ 7, Ex. F; Laoprapassorn Decl. ¶¶ 10–12, Ex. D). Second, Vinh-Sanh states that Sun Fat rice is "sold at a consistently lower price than Vinh-Sanh's . . . rice, confirming the lower quality of the rice in the minds of consumers." Id. (citing Chen Decl. ¶ 26). Third, Vinh-Sanh contends that Sun Fat "engages in sub-standard sales practices as its salespeople cannot even confirm to customers the good quality or Thai Hom Mali certification of the rice," undermining Vinh-Sanh's "ability to control its brand and good reputation." Id. Vinh-Sanh does not adequately support its first assertion, and its second and third assertions, regarding cost and sales practices, merit little consideration. Further, Sun Fat responds that Vinh-Sanh has not demonstrated that legal remedies are insufficient. See MPI Opp'n at 6–8.

### 1. Rice Quality

The U.S. Department of Agriculture, through its official designated private agency California Agri Inspection Co., Ltd., tested both parties' rice. See Viau Decl. (dkt. 43) ¶ 7.[3] The USDA performed a grading analysis and a whiteness analysis on the rice, concluding that Sun Fat's Lucky Coin rice had a moisture value of 12.4% and a whiteness factor of 43.9, whereas Vinh-Sanh's Three Ladies rice had a moisture value of 12.6% and whiteness factor of 44.5. See Viau Decl. ¶ 7; Ex. 7 (dkt. 43-6); Viau Decl. Ex. 7 (dkt. 45-3).[4] At the outset, the Court notes that the unit of measurement involved in either calculation remains a mystery.

---

[3] Sun Fat argues that Vinh-Sanh did not show that it tested rice samples of the same age, which would affect the analysis. See MPI Opp'n at 5. Vinh-Sanh replied that the bags of rice selected for inspection had best-before dates within one month of each other, and hence were "the same approximate age, within one month." Chen Decl. (dkt. 45-1) ¶ 3.
[4] Vinh-Sanh inadvertently omitted the inspection test results for the Three Ladies rice in its motion for preliminary injunction, but included the results in its reply.

13

More important, as Sun Fat argues, Vinh-Sanh fails to put the figures into any "relevant context" or explain whether the differences cited are "either statistically relevant or relevant to how consumers would assess the respective rice brands." See MPI Opp'n at 5. Vinh-Sanh does not explain why greater moisture or greater whiteness represent greater quality. Even assuming that to be the case, there is "no objective basis for concluding that . . . consumers do actually view Sun Fat's . . . rice to be of lesser quality to Plaintiffs' rice." See id. at 5. Vinh-Sanh did not conduct any kind of taste-testing or visual observation of the products by actual customers in order to assess consumer perceptions of quality, or whether differences—in moisture content, whiteness factor, or otherwise—between the brands were perceptible.

While Vinh-Sanh provides some measure of additional support for its rice analysis, it is not persuasive. Kittiphan Laoprapassorn, the export manager at Siam Grains Company, Ltd., has sold to Thai Hom Mali rice to Vinh-Sanh for "many years." Laoprapassorn Decl. ¶ 2. Laoprapassorn declares that Thai Hom Mali rice is harvested once a year, typically in October, when it is softest, whitest, and most fragrant, and so prices are highest at this time. See id. ¶ 5.[5] Harvested rice becomes dryer, harder, yellower, and less fragrant over time. See id. ¶ 6. Siam Grains began to refrigerate rice for Vinh-Sanh in October of 2018 in order to maintain the rice's freshness and to slow the aging process. See id. ¶¶ 6–7; see also Chen Decl. ¶¶ 5–6 (Vinh-Sanh rice refrigerated starting October 2018, "[s]ince August 2019, we have been able to supply 100% silo rice to our customers"). Sun Fat, by contrast, "does not utilize any refrigerated method to store . . . rice." MPI at 6 (citing Oct. 23 Viau Decl. Ex. B (dkt. 43); Def's. Resp. to RFA No. 13; Benny Hong Depo. Tr. 62:4-62:23).

Siam Grains conducted its own testing on the rice it supplied to Vinh-Sanh (rice supplied in July, August, and September of 2019, which was refrigerated in siloes), and

---

[5] Siam Grains produces rice for over one hundred different consumer brands. See Laoprapassorn Decl. ¶ 4.

14

compared it to non-refrigerated rice.[6] Id. ¶ 12. According to Laoprapassorn, the results show that Vinh-Sanh's refrigerated rice "does not age as quickly, shows decreased breakdown, and maintains its freshness longer" and that "[t]hese differences would be recognizable to consumers." Id. ¶ 12. Sun Fat rightfully points out that there is no evidence to suggest that the non-refrigerated rice that Siam Grains tested is Sun Fat's rice. See MPI Opp'n at 4. Vinh-Sanh responds that the non-refrigerated rice it tested reflects the properties of Sun Fat's non-refrigerated rice, and that there is "no reason to question" that this rice is "the same as" Lucky Coin's rice. See MPI Reply at 3. This is unpersuasive. Even if the rice that Siam Grains compared to Vinh-Sanh's rice is similar to Sun Fat's rice because both are unrefrigerated, that is not a side-by-side comparison.

Overall, the Laoprapassorn declaration offers some support for the inference that refrigerated rice is of higher quality at the time of testing than non-refrigerated rice, and could conceivably support the test results provided by the California inspector. However, this chain of inferences does not demonstrate that the potential differences in quality between Vinh-Sanh's and Sun Fat's rice is perceptible to consumers. Plaintiff's counsel does not present any expert opinion as to the differences cited in the USDA test. See Tr. of November 15 Proceedings (dkt. 48) at 17:18–22. Furthermore, Sun Fat's counsel states that "plaintiff's principal also testified that only 20 percent of the rice at issue here is refrigerated in the first place. So 80 percent of the plaintiff's own product isn't even refrigerated." Id. at 9:6–10. Sun Fat's counsel also treated the Court to a description of the journey from refrigerated silo to shelf, including stops in bags, trucks, ships, ports, more trucks, and then American facilities and reseller locations, none of which are refrigerated. Id. at 8:5–9:4. Is refrigeration of 20% of Vinh-Sanh's rice in a silo, and then never again, something consumers are certain to recognize? The Court is in no position to

---

[6] Siam Grains did an "RVA analysis," which uses a Rapid Visco Analyzer to measure "pasting" and viscosity of rice, and which "aims to obtain a quantitative description of the rice's mechanical properties, to obtain information related to the molecular structure of composition of the rice, and ultimately to predict the final product quality." Laoprapassorn Decl. ¶ 10. This testing was apparently done in Thailand, before the rice had been shipped to this country and of course before it was cooked and consumed by customers in this country.

say.[7]

Vinh-Sanh does not present enough evidence at this point to show that its goodwill and reputation would be irreparably harmed by being associated with Sun Fat's rice.

### 2. Rice Pricing

Vinh-Sanh states that "Sun Fat rice is . . . sold at a consistently lower price than Vinh-Sanh's genuine THREE LADIES rice, confirming the lower quality in the minds of consumers." MPI at 14 (citing Chen Decl. ¶ 26). However, Vinh-Sanh does not convincingly argue how merely lower-priced rice (such as Sun Fat's) would indicate a lower quality rice. See MPI at vi (citing Moroccanoil, Inc. v. Zotos Int'l, Inc. 230 F. Supp. 3d 1161, 1177–78 (C.D. Cal. 2017) as involving lower price and lower quality product); id. at 6 (arguing both that Sun Fat is lower-priced and perceived as inferior). Real evidence of a difference in quality could support its point here—but simply pointing to a lower price does not itself demonstrate irreparable harm.

### 3. Shoddy Sales Practices

Vinh-Sanh next argues that Sun Fat "engages in sub-standard sales practices as its salespeople cannot even confirm to customers the good quality or Thai Hom Mali certification of the rice," undermining Vinh-Sanh's "ability to control its brand and good reputation." MPI at 14. What Vinh-Sanh refers to as Sun Fat's "shoddy" sales practices is Ming Hong, Sun Fat's president, admitting in his deposition to being unfamiliar with the Thai Hom Mali certification, "not knowing whether Sun Fat rice is good quality or not," and further stating that Sun Fat cannot "guarantee to its customers that its rice is good quality." MPI at 6–7 (citing Ming Hong Depo. Tr. 98:4-7, 102:23-103:18, 104:23-105:1). The contention that Vinh-Sanh is being damaged by customers' association with these "shoddy sales practices" is tenuous, however.

### 4. Sufficiency of Legal Remedies

Sun Fat argues that legal remedies are sufficient in this case. See MPI Opp'n at 3–

---

[7] Nor do generic statements, like that of the general manager of a grocery store that Vinh-Sanh's rice is "high quality," see Ly Decl. ¶ 6, carry Vinh-Sanh's burden.

16

8. Sun Fat asserts that Vinh-Sanh has "not adequately supported its vague claims of harm to goodwill and reputation," so to the extent that irreparable harm is attributable simply to Vinh-Sanh's rice "being undersold by Sun Fat," Vinh-Sanh failed to show that monetary damages are inadequate. See MPI Opp'n at 7. The Court agrees.[8]

### 5. Overall Showing on Irreparable Harm

Vinh-Sanh's arguments regarding rice quality, rice pricing, and "shoddy" sales practices do not demonstrate solid evidence of irreparable harm. See Herb Reed. Enters., 736 F.3d at 1249.

### C. Balance of Hardships and Public Interest

The remaining Winter factors concern the balance of hardships between the parties, and the public interest.

As to balance of hardships, Vinh-Sanh argues that it stands to lose the goodwill it has worked to establish. TRO App. at 15; MPI at 15. But the hardship to Sun Fat would be significant: Sun Fat "has rice on order and its inventory that it would be refrained from selling if Plaintiff's Proposed Order is granted." TRO Opp'n at 3. As of the TRO hearing, Sun Fat had orders ready to ship (about 4,000 bags) that needed to be shipped soon as the rice has an expiration date. See Hong Decl. ¶ 16. If it was restrained "from selling its current inventory, filling its current orders, and unable to pay its factory bills, [Sun Fat's CEO] estimate[s] the loss would be about $1 million." Id. In other words, "Sun Fat [would] suffer a devastating blow." TRO Opp'n at 13. Vinh-Sanh, conversely, states that Sun Fat has only used the infringing marks in 2019 or since late 2018, and "may further re-package its rice with little disruption." MPI at 15. Vinh-Sanh further notes that Sun Fat has "submitted no declaration in its [current MPI opposition] updating its current

---

[8] Sun Fat also argues that Vinh-Sanh delayed in seeking injunctive relief. See MPI Opp'n at 8 (citing iFreedom Direct Corp. v. McCormick, No. SACV 16-470-JLS (KESx), 2016 WL 9049647 (C.D. Cal. June 15, 2016)). Not so. Vinh-Sanh sought injunctive relief just one week after filing suit. See MPI Reply at 7; Compl.; TRO App. Moreover, "delay is but a single factor to consider in evaluating irreparable injury" and "courts are 'loath to withhold relief solely on that ground.'" Arc of Cal. v. Douglas, 757 F.3d 975, 990 (9th Cir. 2014) (quoting Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211, 1214 (9th Cir. 1984)).

17

inventory, orders on hand, and prospective loss if it should be enjoined from selling the Lucky Coin rice," and that Sun Fat "has admitted that it has not made recent orders of the rice." MPI Reply at 10. Still, while Vinh-Sanh contends that Sun Fat's harm is entirely of its own making, see TRO App. at 15 (quoting Cadence Design Sys. v. Avant! Corp., 125 F.3d 824, 829 (9th Cir. 1997) ("a defendant who knowingly infringes another's copyright 'cannot complain of the harm that will befall it when properly forced to desist from its infringing activities'") (internal citation omitted)), this Court would not undertake an injunction lightly given the hardship likely to befall Sun Fat.

As for the public interest, this factor favors Vinh-Sanh: "[p]reventing consumer confusion serves the public interest." Stark v. Diageo Chateau & Estate Wines Co., 907 F. Supp. 2d 1042, 1067 (N.D. Cal. 2012); MPI at 15. Sun Fat's argument that the relevant interest is in being able to buy cheaper rice is unpersuasive. See TRO Opp'n at 14–15.

### D. Winter Factors: Conclusion

While Vinh-Sanh is likely to prevail on the merits of its trademark claims, and while the public interest further favors Vinh-Sanh, Vinh-Sanh fails to sufficiently show that irreparable harm would occur absent issuance of a preliminary injunction, and the balance of hardships favors Sun Fat.

## IV. CONCLUSION

For the foregoing reasons, the motion for preliminary injunction is DENIED.

**IT IS SO ORDERED.**

Dated: November 22, 2019

_____
CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE